## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUNLINE USA LLC | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  22-1650 |
| | : | |
| EZZI GROUP, INC., AHMAD | : | |
| RASOULI, STERLING ARC CORP., | : | |
| ROBIN SHUGAR, ARON BUCHMAN | : | |

## <u>MEMORANDUM</u>

**MURPHY, J.**                                                        **December 28, 2023**

A plaintiff cannot sue anywhere it likes.  There are statutory and other requirements for jurisdiction and venue that limit a plaintiff's options.  And sometimes a plaintiff chooses a venue that is permissible, yet inconvenient.  Courts have the power to transfer or even dismiss a badly misplaced case.  Usually, transfer is right fix, but if the alternative forum is in another country, the only option is dismissal under a doctrine known as *forum non conveniens*.  That is what one of the Canadian defendants in this case seeks.

The moving defendant wound up here because she reached out to the plaintiff — a local company — to solicit business.  She allegedly misrepresented her credentials and arranged for U.S.-based transactions that ended badly.  The plaintiff chose to sue on its home turf.

Canada would have been a reasonable place for this lawsuit.  But our job is not to decide which location is better.  Rather, the law places a heavy burden on the defendant to show that litigating in Canada would vex her so badly that it overwhelms the deference we give to the plaintiff's choice to sue in Pennsylvania.  The defendant failed to meet her burden.  Therefore, we deny her motion to dismiss for *forum non conveniens*.

The same Canadian defendant also tries invoking the arbitration clause of the agreement that she helped her company make with the plaintiff.  She is not a party to agreement, but she argues that her position within the company — and her role in performing the promises in the agreement — means that she should benefit from the agreement to arbitrate.

On that, we agree.  The Third Circuit permits non-signatories to invoke the terms of an agreement when an agency relationship exists between a non-signatory and signatory, or the claims against a non-signatory are intertwined with the contract itself.  The record supports both of these scenarios.  Therefore, we grant the moving defendant's motion to compel the claims to arbitration.

## I.    Factual Allegations

The plaintiff, Sunline USA LLC, d/b/a Sunline Supply, is based in Pennsylvania.  DI 11 ¶ 16.  Sunline specializes in procuring personal protective equipment (PPE) for willing buyers, such as healthcare and pharmaceutical entities.  *Id.* ¶ 1.  But none of the defendants that Sunline sues is Pennsylvanian.  *See id.* ¶¶ 17-21.

One of the defendants, Sterling Arc Corp., is a Canadian company "that markets itself as a broker in the global PPE market."  *Id.* ¶ 8.  Sterling connects distributors of PPE with manufacturers of PPE.  *Id.*  Sterling "contacted Sunline at Sunline's offices in Bridgeport, Pennsylvania, to solicit business from Sunline in the PPE sector."  *Id.* ¶ 28.

Another defendant — Robin Shugar — is a resident of Toronto, Canada and one of the "owners, officers, and principals of Sterling."  *Id.* ¶ 9.  She and co-defendant Mr. Aron Buchman contacted Sunline on behalf of Sterling.  *Id.*  Ms. Shugar told Sunline's representatives that Sterling, leveraging its network and experience, could connect Sunline with high quality and reputable PPE manufacturers in China.  *Id.* ¶ 30.

2

Sunline was led to believe that Ms. Shugar was a licensed Canadian attorney who would furnish Sunline with legal advice to further its PPE business. *Id.* ¶¶ 32-33. But in reality, Ms. Shugar could provide no such service because her Canadian law license being administratively suspended. *Id.* ¶ 45. Sunline learned this only after conducting business with Sterling. *Id.* ¶ 45. Ms. Shugar collected $60,000 from Sunline in "consulting fees" for the legal representation she allegedly provided. *Id.* ¶ 42.

Around July 16, 2020, Sterling, Ms. Shugar, and Mr. Buchman ("the Sterling Defendants")[1] presented Sunline with a draft Affiliate Referral Agreement, and the parties entered negotiations. *See id.* ¶¶ 34-35. Based on the Sterling Defendants' representations, Sunline executed the final agreement on August 10, 2020. *Id.* ¶¶ 39-40.[2] But concurrent with

---

[1] Sunline refers to the three defendants as the Sterling Defendants in its amended complaint. *Id.* ¶ 10.

[2] The agreement, attached to Sunline's amended complaint, has a choice-of-law provision:

> The validity of this Agreement and any of its terms or provisions, as well as the rights and duties of the Parties hereunder and the interpretation and performance of all its terms shall be governed by the Uniform Commercial Code as interpreted by Canadian laws and courts . . . .

*See id.* Ex. B ¶ 22; *see also In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (second alteration in original) (second internal quotation marks omitted) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)) ("[A] 'document . . . *explicitly relied* upon in the complaint' may be considered" at the motion to dismiss stage "without converting the motion [to dismiss] into one for summary judgment.").

The agreement also includes an arbitration provision:

> Any controversy or claim arising out of or relating to any of the provisions of this Agreement or this Agreement's enforcement, breach or default, shall be settled by Arbitration with an Arbitrator mutually agreed to by the Parties, in accordance to the applicable rules. The seat of the arbitration tribunal shall be under the rule of conciliation and arbitration of the International Chamber of Commerce Court of

negotiations, Sunline received a bulk order for nitrile gloves from Mammoth RX, a customer in the PPE business. *See id.* ¶ 35. The Sterling Defendants offered to assist Sunline in fulfilling this order, and Sunline accepted. *Id.* ¶ 36.

In furtherance of this arrangement, Sunline paid the Sterling Defendants an $897,000 deposit, which the Sterling Defendants promised to hold in escrow. *Id.* ¶ 37. The parties agreed that the deposit would be returned to Sunline, along with a referral fee, upon Sterling's receipt of payment from Mammoth. *Id.* The payment never came because Mammoth eventually withdrew its order. *Id.* ¶ 46. Sunline requested a refund of its deposit. *Id.* ¶ 47. But the Sterling Defendants refunded only $375,000, indicating that the remaining $522,000 would be held in escrow to fund additional deals between Sunline and Sterling. *Id.* ¶¶ 48-49.

In December 2021, the Sterling Defendants introduced Sunline to Canada-based Ezzi Group, Inc., a "supply chain and distribution partner for PPE manufacturers and supply companies around the world." *Id.* ¶¶ 2, 50. The Sterling Defendants attested to Ezzi's reputability and recommended that Sunline purchase PPE from Ezzi. *Id.* ¶¶ 51-52. Ezzi mailed to Bridgeport, Pennsylvania a sample of nitrile gloves, which Sunline tested to verify quality. *Id.* ¶ 54. Sunline then bought over one million boxes of nitrile gloves from Ezzi. *Id.* ¶ 57. The parties understood that the purchased gloves would ultimately be delivered to Bridgeport, Pennsylvania. *Id.* ¶ 11. Between February 25, 2021 and March 29, 2021, Sunline paid Ezzi $1,368,000 for glove and supply purchases. *Id.* ¶ 58. Sunline also paid Sterling "hundreds of thousands of dollars in 'referral fees'" for its transactions with Ezzi. *Id.* ¶ 59.

---

Arbitration, and should the parties be unable to agree on the arbiter, the tribunal shall select an arbiter.

*Id.* Ex. B ¶ 23.

Sunline received an initial batch of gloves from Ezzi at Sunline's warehouse in China on April 7, 2021.  *Id.* ¶ 61.  But testing revealed that the gloves were polyvinyl chloride instead of nitrile rubber.  *See id.* ¶ 63.  Sunline demanded that Ezzi either produce nitrile gloves or provide a refund.  *Id.* ¶ 64.

Ezzi refused.  *Id.* ¶ 65.  Sunline's demands to the Sterling Defendants to return Ezzi-related referral fees — as well as the remaining deposit balance from the Mammoth transaction — were also rebuffed.  *Id.* ¶¶ 68, 72.  So Sunline sued Ezzi and the Sterling Defendants.  *Id.* at 1.

## II.   <u>Ms. Shugar's Motion</u>

Sunline brings two causes of action against Ms. Shugar: fraud, *see id.* ¶¶102-10, and RICO, *see id.* ¶¶ 111-19.  About six months after Sunline filed its amended complaint, Ms. Shugar moved to dismiss because litigating in the Eastern District of Pennsylvania is inconvenient.  *See generally* DI 32.  Ms. Shugar argues that a proper balancing of private and public factors demonstrates that Canada is the place to resolve Sunline's claims.  And should we conclude that the case stays here, Ms. Shugar argues that the Affiliate Referral Agreement requires arbitration.  *See id.* at 11-14.  She argues that Sunline's causes of action against her arise out of the terms of the agreement, thus, they "are subject to arbitration."  *Id.* at 14.

Sunline disagrees.  *See generally* DI 34.  It responds that Ms. Shugar has not "carried her heavy burden" to show why we should dismiss its case.  *Id.* at 6 (cleaned up).  Further, Sunline argues that Ms. Shugar cannot move to compel its claims to arbitration because she did not individually contract with Sunline.  *Id.* at 10-12; *see id.* at 11 ("[T]here is no contract language to interpret because [Ms.] Shugar and [Sunline] never contracted with each other.").

Ms. Shugar replies that her position as a non-signatory to the Affiliate Referral Agreement does not affect her request for arbitration because it is "well settled" Third Circuit law that "non-signatories may invoke equitable estoppel to" arbitrate claims.  DI 35 at 6.  Ms. Shugar argues that the allegations against her show that Sunline's fraud and RICO claims are intertwined with the execution of the agreement.  *See id.* at 7.  And she also argues that the arbitration provision applies because Sunline alleges that she acted as Sterling's agent.  *Id.*

We have jurisdiction over Sunline's claims against Ms. Shugar.  *See* 28 U.S.C. §§ 1331, 1367.  The motion is ripe for disposition.  For the reasons explained below, we deny Ms. Shugar's motion for *forum non conveniens*.  But in the alternative, we grant Ms. Shugar's motion to compel arbitration.

III.   **Analysis**

A. **Ms. Shugar fails to demonstrate that the public and private factors prescribed by the Third Circuit favor dismissal and litigation in Canada.**

Under the doctrine of *forum non conveniens*, a district court may dismiss a case "on the ground that a court abroad is the more appropriate and convenient forum for adjudicating the controversy."  *Sinochem Int'l Co. v. Malay Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007).  The Third Circuit's analysis is three-fold.  First, the court must ascertain whether there is an adequate alternate forum to hear the plaintiff's case.  *Trotter v. 7R Holdings LLC*, 873 F.3d 435, 442 (3d Cir. 2017).  Then, if such a forum exists, the court must decide how much deference to give the plaintiff's forum choice.  *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 160 (3d Cir. 2010).  Finally, the court must "balance the relevant private and public interest factors" to determine whether proceeding in an alternate forum would be more appropriate and convenient for the parties.  *Trotter*, 873 F.3d at 442 (quoting *Eurofins*, 623 F.3d at 160); *see also*

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947) (providing a non-exhaustive list of private and public interest factors).

A defendant invoking *forum non conveniens* bears the burden of persuasion at each of these three stages. *Lony v. E.I. Du Pont de Nemours & Co.* ("*Lony II*"), 935 F.2d 604, 609 (3d Cir. 1991). Dismissal for *forum non conveniens* is uncommon. *See Sinochem*, 549 U.S. at 430; *Gulf Oil*, 330 U.S. at 504 (describing the "exceptional circumstances" needed for dismissal for *forum non conveniens* and "those rather rare cases where the doctrine should be applied.").

While Ms. Shugar has carried her burden of showing Canada is an adequate alternative forum, she does not persuade us that private and public factors significantly outweigh Sunline's selected forum. For the reasons explained below, we deny her motion.

1. Canada is an adequate alternative forum.

*Forum non conveniens* analysis begins with an inquiry into whether an adequate alternative forum exists. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 n.22 (1981). The standard for "adequate" in this context is quite low — it is generally satisfied "where defendants are amenable to process and plaintiffs' claims are cognizable." *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013); *see also Piper Aircraft*, 454 U.S. at 254 n.22 (similar). Courts should not deny *forum non conveniens* motions just because an alternative forum has laws that are less favorable to the plaintiff than the chosen forum. *See Piper Aircraft*, 454 U.S. at 238. In addition, the prospect of substantive law in the alternate forum being changed should not receive "even substantial weight." *Id.* at 247. Only in the "rare circumstances" where the alternate forum's remedy "is so clearly inadequate or unsatisfactory that it is no remedy at all" will the alternate forum be deemed inadequate. *Id.* at 254, 254 n.22.

Here, the "rare circumstances" that must exist to deem an alternative forum inadequate are not present. Ms. Shugar — a Canadian citizen — is amenable to process in Canada, Sunline's claims are cognizable, and the differences between U.S. and Canadian law are nowhere near such that remedy "is so clearly inadequate or unsatisfactory that it is no remedy at all." *Id.* at 254 n.22. Thus, Canada meets the low bar for adequacy.

> 2. Sunline's choice of forum enjoys a strong presumption of convenience because Sunline has a bona fide connection to the Eastern District of Pennsylvania.

The second step in *forum non conveniens* analysis is determining how much deference the plaintiff's choice of forum deserves. The Supreme Court's answer to this question is clear: "a plaintiff's choice of forum should rarely be disturbed." *Id.* at 252; *see also Windt v. Commc'ns Int'l, Inc.*, 529 F.3d 183, 189 (3d Cir. 2008). Courts should exercise discretion to dismiss a case for *forum non conveniens* only when either (1) a plaintiff's chosen forum is of "such oppressiveness and vexation to a defendant as to be out of all proportion to the plaintiff's convenience, which may be shown to be slight or nonexistent," or (2) "trial in the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems." *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947); *see also Lony II*, 935 F.2d at 609 (citing *Koster*, 330 U.S. at 524).

In this way, the plaintiff's choice of forum enjoys "a strong presumption of convenience." *Windt*, 529 F.3d at 190. This presumption exerts even greater force when a defendant attempts to deprive an U.S. plaintiff of access to a U.S. forum. *See Lacey v. Cessna Aircraft Co.* ("*Lacey II*"), 932 F.2d 170, 178 (3d Cir. 1991) (citing *Piper Aircraft*, 454 U.S. at 255); *cf. Windt*, 529 F.3d at 634 (finding that the district court did not abuse its discretion in giving foreign plaintiffs' choice of forum a low degree of deference); *Lony v. E.I. Du Pont de Nemours & Co.* ("*Lony I*"), 886 F.2d 628, 634 (3d Cir. 1989) ("[T]he reason for giving a foreign

plaintiff's choice less deference is not xenophobia but merely a reluctance to assume that the choice is a convenient one.").

Sunline is a Pennsylvania company, and it selected the Eastern District of Pennsylvania — its home jurisdiction,[3] and the place where the disputed events occurred.  DI 11 at 1, 5; DI 32-2 at 2; DI 34 at 1-2.  Therefore, the chosen forum is presumptively convenient. While not immutable, the choice should not be disturbed unless litigating here oppresses and vexes Ms. Shugar "as to be out of all proportion" to the plaintiff's considerable convenience. *Koster,* 330 U.S. at 524.

Nevertheless, "the Supreme Court has prescribed a balancing of private interest factors affecting the convenience of the litigants and public interest factors affecting the convenience of the forum" to answer whether a party is oppressed or vexed by the chosen forum.  *Windt,* 529 F.3d at 189.  Applying the factors below, we conclude that litigating here does not convincingly oppress Ms. Shugar.

    3.  <u>Ms. Shugar fails to establish that the private and public interest factors decidedly favor trial in a foreign forum.</u>

The final step is to weigh the following private interest factors:

    (1) relative ease of access to sources of proof;
    (2) availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses;
    (3) possibility of view of premises, if view would be appropriate to the action; and
    (4) all other practical problems that make trial of a case easy, expeditious and inexpensive.

and the following public interest factors:

    (1) administrative difficulties flowing from court congestion;
    (2) the "local interest in having localized controversies decided at home";

---

[3] Bridgeport, Pennsylvania, where Sunline has its principal business address, is within the Eastern District of Pennsylvania.  DI 11 ¶ 16.

> (3) the interest in having the trial of a diversity case in a forum that is at
> home with the law that must govern the action;
> (4) the avoidance of unnecessary problems in conflict of laws, or in the
> application of foreign law; and
> (5) the unfairness of burdening citizens in an unrelated forum with jury
> duty.

*Gulf Oil*, 330 U.S. at 508; *Piper Aircraft*, 454 U.S. at 241 n.6 (referencing *Gulf Oil*, 330 U.S. at

509).

Ms. Shugar must demonstrate that "the private and public interest factors weigh heavily

in favor of dismissal." *Lony II*, 935 F.2d at 609. Indeed, to prevail, she "must show that the

balance of these factors tips *decidedly* in favor of a trial in a foreign forum." *Windt*, 529 F.3d at

192 (emphasis added) (citations omitted).

> i. *The private interest factors do not offer the decisive support needed to justify
> dismissing Sunline's claim.*

Neither the private interest factor of access to proof nor availability of witnesses moves

the needle significantly. Ms. Shugar asserts that all the evidence and the majority of witnesses

are located in Canada. DI 32-2 at 9. That seems doubtful. *See* DI 34 at 7-8. But even accepting

Ms. Shugar's contention as true, it is easy enough to obtain evidence from Canadian third parties.

No laws in Canada restrict foreign litigants from taking evidence from a willing person in private

civil matters. *See* Pamela D. Pengelley, *A Compelling Situation: Enforcing American Letters

Rogatory in Ontario*, 85 CANADIAN BAR REV. 345, 345 (2006). U.S. parties can, for example,

depose Canadian witnesses without obtaining permission from or even consulting with

authorities in Canada. *See id.* That task is made easier still through videoconferencing,[4] which

mitigates the cost of travel. DI 34 at 8. It might be trickier if a Canadian witness is unwilling to

---

[4] The physical location of witnesses has become less significant in the era of remote
work. *See Nat'l Asset Mgmt. v. Coleman*, 2010 WL 3338343, at *4 n.2 (W.D. Pa. 2010); *see
also James-Velardo v. United States*, 2017 WL 2972690, at *2 (E.D. Pa. 2017).

voluntarily testify or produce documents.  *See* DI 32-2 at 9.  But Canada has an established

system for compelling evidence in such situations.  *See Requesting Mutual Legal Assistance*

*from Canada*, GOV'T OF CANADA (last updated July 7, 2021), https://www.justice.gc.ca/eng/cj-

jp/emla-eej/mlaguide-guideej.html (hereinafter "*Mutual Legal Assistance*").

      Canadian courts do not rubber stamp letters rogatory[5] — far from it.[6]  *Id.*  But they

generally will endeavor to assist U.S. litigants in compelling evidence from Canadian witnesses,

having for decades adopted a liberal approach to enforcing letters rogatory.  Pengelley, *A*

*Compelling Situation*, at 347-48; *see also Zingre et al. v. The Queen*, [1981] 2 S.C.R. 392, 401

(Can.) ("It is upon this comity of nations that international legal assistance rests . . . .  A foreign

request is given full force and effect unless it be contrary to the public policy of the jurisdiction

to which the request is directed or otherwise prejudicial to the sovereignty or the citizens of the

latter jurisdiction." (citation omitted)); *District Court of United States, Middle District of Florida*

*v. Royal American Shows Inc.*, [1982] 1 S.C.R. 414, 421 (Can.) ("[C]omity dictates that a liberal

approach should be taken to requests for judicial assistance, so long at least as there is more than

ephemeral anchorage in our legislation to support them."); *Republic of France v. De Havilland*

*Aircraft of Canada Ltd. and Byron-Exarcos*, [1991] 3 O.R. (3d) 705 (Can. Ont. C.A.) ("In an

---

[5] To compel evidence in Canada, U.S. litigants must obtain, from a U.S. court, a letter rogatory (or "letter of request") formally requesting a Canadian court's assistance in procuring evidence from a witness.  *Mutual Legal Assistance*.  U.S. litigants must then apply to a Canadian court to have that request enforced.  *Id.*

[6] In deciding whether to give effect to letters rogatory, Canadian courts expect parties to establish that: "(1) the evidence sought is relevant; (2) the evidence sought is necessary for trial and will be adduced at trial, if admissible; (3) the evidence is not otherwise obtainable; (4) the order sought is not contrary to public policy; (5) the documents sought are identified with reasonable specificity; (6) the order sought is not unduly burdensome , having in mind what the relevant witnesses would be required to do, and produce, were the action to be tried here." *Friction Division Products, Inc. and E. Du Pont de Nemours & Co. (No. 2)*, [1986] 56 O.R. (2d) 722, 732 (Can. Ont. C.A.).

ever-shrinking world, Canadian courts often require the assistance of foreign courts so as to do justice between the parties engaged in litigation in Canada.  A receptive judicial ear to requests from foreign courts can only enhance the chances that a Canadian court will receive assistance when required.").

In light of the Canadian courts' accommodating posture towards U.S. discovery, the private interest factors of access to proof and availability of witnesses offer, at best, modest support for dismissal.  Thus, even with significant Canadian discovery, this case can proceed here without significant friction.

Ms. Shugar's familiarity with the United States as a place of commerce further weakens her argument that Pennsylvania is an inconvenient forum.  *See* DI 11 ¶ 29.  Sterling's raison d'être, after all, is connecting distributors of PPE in the United States with reputable manufacturers.  DI 11 ¶ 29; DI 32-2 at 1-2; *see In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 1998 WL 1969647, at *8 (E.D. Pa. 1998) (citing the defendants' numerous business connections to the Eastern Seaboard and the United States generally as "further ilute[ing] [the defendants'] argument that Maryland is an inconvenient forum for this action").

The ease of viewing the premises is largely irrelevant because there is no serious prospect of that happening here.  *Windt*, 529 F.3d at 189 (citing *Gulf Oil*, 330 U.S. at 508).  Unlike *Gulf Oil* and *Piper Aircraft*, which arose from destructive accidents with observable locations, Sunline's case has no "site" per se for a jury to scrutinize.  *Gulf Oil*, 330 U.S. at 502-03; *Piper Aircraft*, 454 U.S. at 238-39; DI 11 at 2-3; DI 32-2 at 1-3.  Instead, the lawsuit centers on alleged fraudulent business practices.  *See* DI 11 at 2-3; DI 32-2 at 1-3.  This factor therefore receives no weight.

Overall, the private factors do not offer Ms. Shugar the convincing support she needs to overcome Sunline's choice of forum.

      ii.   *The public interest factors pull in conflicting directions, which is not enough to dismiss Sunline's complaint.*

The public factors do not change the outcome here either.  The first public interest factor — administrative difficulties flowing from court congestion — deserves no weight.  Neither party contends that administrative difficulties would preclude us from adjudicating the instant case.  And we agree.

Regarding local interest, both the United States and Canada have legitimate interests.  Ms. Shugar resides in Toronto, Canada, as do her co-defendants.  DI 11 ¶¶ 19-21.  She is employed by a Canadian corporation.  DI 32-2 at 1-2; DI 11 ¶¶ 18, 20.  Courts recognize that jurisdictions bear responsibility for policing businesses within their borders for wrongdoing, wherever it may occur.  *See, e.g.*, *Lony I*, 886 F.2d at 642; *Incubadora Mexicana, SA de CV v. Zoetis, Inc.*, 116 F. Supp. 3d 519, 525 (E.D. Pa. 2015) ("Pennsylvania has an interest in ensuring that its corporations do not engage in tortious conduct which causes injury to anyone, regardless of where those individuals reside.").  So, Canada is no different as it pertains to Sterling and its agents.

At the same time, the United States has an equally compelling interest in ensuring that foreign businesses engaging with the U.S. market do so lawfully.  *See, e.g.*, *Lony I*, 886 F.2d at 642 ("Delaware is interested in ensuring that business incorporated or operating within its borders abide by the law.").  When a foreign defendant solicits business in the United States, "the United States have an interest in seeing that the plaintiff is provided a convenient local forum, especially when the only alternative forum available to the plaintiff is outside the United States."  *Lehman v. Humphrey Cayman, Ltd.*, 713 F.2d 339, 344 (8th Cir. 1983).  We also must

"consider the locus of the alleged culpable conduct, often a disputed issue, and the connection of that conduct to the plaintiff's chosen forum." *Lacey v. Cessna Aircraft Co.* ("*Lacey II*"), 862 F.2d 38, 48 (3d Cir. 1988) (internal quotation marks omitted) (quoting *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528 (1988)); *see also Piper Aircraft*, 454 U.S. at 260 (deeming Scotland as the locus of conduct, in no small part because "[t]he accident occurred in [Scotland's] airspace").

Here, Pennsylvania was the focal point of the events — giving the United States a compelling interest. Sunline's case is not tethered a specific country through an accident site, but the events leading to the parties' lawsuit were oriented more toward Pennsylvania than Canada. The parties' relationship began when Sterling "contacted Plaintiff at its offices in Bridgeport, Pennsylvania to solicit business from Sunline in the PPE sector." DI 32-2 at 2; *see also* DI 11 ¶ 28; DI 34 at 1-2. And the Sterling Defendants (1) communicated repeatedly with Sunline's representatives in Pennsylvania; (2) mailed samples directly to Sunline's Bridgeport, PA offices; and (3) transacted with Sunline knowing that Pennsylvania would be the ultimate destination for any products purchased by Sunline. *See* DI 32-2 at 2-3; DI 11 ¶¶ 25, 54. "Typically the most appropriate venue is where a majority of events giving rise to the claim arose," *In re Amkor Tech., Inc. Sec. Litig.*, 2006 WL 3857488, at *5 (E.D. Pa. 2006), and because Pennsylvania is the locus of the alleged conduct, the local interest factor modestly favors the United States.

The next two public interest factors are interrelated and weigh somewhat in favor of dismissal: "the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action," and "the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law." For starters, the prospect of needing to apply foreign law invites dismissal. *Piper Aircraft*, 454 U.S. at 259; *see also Gulf Oil*, 330 U.S. at 509. And

"[i]n a federal question case, [we] look to the choice of law principles of the forum state to determine which state's law applies." *Gregoria v. Total Asset Recovery, Inc.*, 2015 WL 115501, at *3 (E.D. Pa. Jan. 8, 2015) (citing *Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007)).[7]

Usually, in Pennsylvania, the choice-of-law rules require a three-step analysis, *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007), but our analysis is truncated by the parties' Affiliate Referral Agreement, which includes a clause electing Canadian law. *See* Affiliate Referral Agreement ¶ 22. And "Pennsylvania courts generally enforce choice-of-law provisions in contracts." *Echols v. Pelullo*, 377 F.3d 272, 275 (3d Cir. 2004); *see also Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) ("Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them."). The parties' intent to follow Canadian law should be honored. *See* Affiliate Referral Agreement ¶ 22.

And the terms of the Affiliate Referral Agreement — including the choice-of-law clause — would likely apply to Ms. Shugar.[8] Sunline argues that the Agreement does not control because it sued Ms. Shugar in her individual capacity. DI 34 at 8. Not so. Courts in the Third Circuit have enforced contracts involving non-signatory parties in comparable circumstances. *See, e.g.*, *AAMCO Transmissions, Inc. v. Romano*, 42 F.Supp.3d 700, 708 (E.D. Pa. 2014) ("In the Third Circuit, a non-signatory party may enforce a forum selection clause in a contract if the party is a third-party beneficiary of the contract *or is closely related to the contractual relationship or dispute such that it is foreseeable that the party will be bound*."

---

[7] As it pertains to Ms. Shugar, Sunline asserts a fraud and RICO claim, and we have federal question jurisdiction over the RICO claim.

[8] On this point, the parties do not provide much briefing. And the question of whether the terms of the agreement apply to Ms. Shugar is critical for deciding whether the claims against her should be arbitrated. *See infra* Section III.B.

(emphasis added)); *see also Cambridge Mgmt. Grp., LLC v. Baker*, 2013 WL 1314734, at *11 (D.N.J. Mar. 28, 2013) ("Because it is clear that the [non-signatory parties'] conduct is closely and directly related to the contractual relationship between the [contracting party] and [plaintiff], the *choice of forum and law clause . . .* are applicable to the [non-signatory parties]." (emphasis added)).

Ms. Shugar presented herself as the one of the "owners, officers, and principals of Sterling." DI 32 at 2; *see also* DI 11 ¶ 9. The Affiliate Referral Agreement ostensibly describes an arrangement between Sterling and Sunline. But as a member of Sterling's management, Ms. Shugar is "closely related to [that] contractual relationship," and in the event of a dispute, "it is foreseeable that . . . [she] will be bound." *AAMCO*, 42 F. Supp. 3d at 708. After all, Ms. Shugar herself signed the agreement on behalf of Sterling — and as chief executive officer, no less. Affiliate Referral Agreement at 8. Although Sunline's RICO and fraud claims against Ms. Shugar may lie outside the umbrella of breach of contract, in analogous situations, the Third Circuit has enforced contractual clauses against non-contractual theories because they still "arise out of the contractual relation" in question and "implicate the contract's terms." *Cf. Liberty Surplus Ins. Corp. v. AXA Ins. Co.*, 788 F. App'x 850, 853 (3d Cir. 2019) (internal quotation marks omitted) ("[P]leading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms."); *see also Crescent Int'l, Inc. v. Avatar Cmtys., Inc.*, 857 F.2d 943, 944 (3d Cir. 1988).

The final public interest factor admonishes that "[j]ury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil*, 330 U.S. at 508-09. It reflects a cognizance of the significant time and resource expenditure

needed from those who are empaneled.  *Piper Aircraft*, 454 U.S. at 244.  Pennsylvania is not

only related to this suit, but it is also the locus of the alleged culpable conduct.  DI 32-2 at 2-3;

DI 11 ¶¶ 25, 28, 54; DI 34 at 1-2.  Therefore, it would not be unfair to have Pennsylvania

residents serve as jurors in the instant case.  This factor weighs against dismissal.

　　　　In total, Ms. Shugar fails to demonstrate that the public interest factors lean so far in her

direction such that we must dismiss Sunline's complaint.

>    **B.  The claims against Ms. Shugar move to arbitration because of her relationship**
>    **with Sterling and the intertwinement between the allegations against her and the**
>    **Affiliate Referral Agreement.**[9]

　　　　We start by reciting the standard for reviewing Ms. Shugar's motion to compel

arbitration.  "A motion to compel arbitration calls for a two-step inquiry into (1) whether a valid

agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that

agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005); *see Kirleis*

*v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009).  "This determination

applies equally in domestic and international arbitration contexts." *Century Indem. Co. v.*

*Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos.*

*950548, 950549, & 950646*, 584 F.3d 513, 523 (3d Cir. 2009).  And "[a]lthough a presumption

in favor of arbitration exists, that presumption applies only when interpreting the scope of an

---

[9] Neither party briefed us on whose laws we should use to decide whether Ms. Shugar is bound by the Affiliate Referral Agreement's arbitration provision.  Instead, both parties rely on Third Circuit case law and decisions from the Eastern District of Pennsylvania without commenting on why they are doing so.  In the absence of any dispute, we will follow the lead of the parties and use Third Circuit cases.  But we note that, when disputed, the choice-of-law issues can be complicated in a situation like this.

arbitration agreement, not whether a valid agreement exists." *Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 n.3 (3d Cir. 2014).

"[W]e must initially decide whether the determination" of arbitration should be "made under Fed. R. Civ. P. 12(b)(6) or 56." *Sanford v. Bracewell & Giuliani, LLP*, 618 F. App'x 114, 117 (3d Cir. 2015). "[W]hen it is apparent, based on 'the face of the complaint, *and documents* relied on in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" *Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Cap. Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)); *see also id.* at 774 (cleaned up) ("[A] Rule 12(b)(6) standard is inappropriate when . . . the complaint and incorporated documents facially establish arbitrability but the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question in issue.").

Here, the parties dispute prong one of the Third Circuit's two-step inquiry: whether an agreement to arbitrate exists. Specifically, the question is whether Ms. Shugar's status as a non-signatory to the Affiliate Referral Agreement means she cannot arbitrate. Sunline attached the Affiliate Referral Agreement to its amended complaint, so we may decide Ms. Shugar's motion under a 12(b)(6) standard. *See Sanford*, 618 F. App'x at 117; *Pei Chuang v. OD Expense LLC*, 742 F. App'x 670, 673 (3d Cir. 2018) (deciding whether non-signatory was bound by contract using 12(b)(6) standard of review where there was "no dispute supported by the record" as to "the relationships between the parties to the agreements and the non-party"). Applying that

standard, we conclude that the claims against Ms. Shugar must be arbitrated even though she is a non-signatory.

"Because arbitration is a creature of contract law, when asked to enforce an arbitration agreement against a non-signatory to an arbitration clause, we ask 'whether he or she is bound by that agreement under traditional principles of contract and agency law.'" *E.I Dupont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 194-95 (3d Cir. 2001) (quoting *Bel-Ray Co., Inc. v. Chemrite (Pty) Ltd.*, 181 F.3d 435, 444 (3d Cir. 1999)).[10] "Similarly, non-signatories may invoke equitable estoppel to prevent a 'signatory from avoiding arbitration when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *Pei Chuang*, 742 F. App'x at 674. (quoting *Dupont*, 269 F.3d at 202).

For example, in *Pei Chuang*, the Third Circuit affirmed the denial of a motion to compel arbitration where non-signatory defendants made "no showing of an agency relationship between themselves and [the signatory] aside from [the non-signatory's] name on behalf of [the signatory] on the . . . [a]greement's signature page." *Id.* at 674. The non-signatories "executed" a supply agreement on behalf of a non-party Chinese LLC, but the plaintiff — an investor —did "not know and [did] not allege a relationship between" the Chinese LLC and the non-signatories. *Id.* at 672. "[A]bsent more" information, the Third Circuit could not infer an agency relationship existed. *Id.* at 674. Further, the Third Circuit said that the claims against the non-signatories

_____

[10] The Third Circuit has said that the rule in *DuPont*, which applied Delaware state law, is "essentially the same" as Pennsylvania law: "'non-signatories to an arbitration agreement can enforce such an agreement when there is an obvious and close nexus between the nonsignatories and the contract or the contracting parties' . . . [and if] claims against [the non-signatory] are inextricably entwined with the Contract." *White v. Sunoco, Inc.*, 870 F.3d 257, 263 n.5 (3d Cir. 2017) (alterations in original) (internal quotation marks omitted) (quoting *Elwyn v. DeLuca*, 48 A.3d 457, 463 (Pa. Super. Ct. 2012)).

19

were not "intertwined" with the supply agreement because the allegations involved "inducing [the investor] to sign the agreements." *Id.*

Here, based on the allegations in the complaint and the Affiliate Referral Agreement, an agency relationship existed between Ms. Shugar and Sterling such that the claims against her should be settled in arbitration.  Unlike *Pei Chuang*, Sunline itself alleges an agency relationship existed between Sterling (the signatory) and Ms. Shugar (the non-signatory).  *See* DI 11 ¶ 9 (Ms. Shugar was one of the "owners, officers, ***and principals*** of Sterling" (emphasis added)).  The amended complaint describes Ms. Shugar's integral role in drafting the Affiliate Referral Agreement and in executing the agreement's terms on Sterling's behalf.  *See, e.g.*, *id.* ¶¶ 32-34, 36-38, 42, 45.

Moreover, the allegations supporting Sunline's claims of fraud and RICO against Ms. Shugar are clearly linked to the execution and terms of the Affiliate Referral Agreement.  *See, e.g.*, *id.* ¶¶ 40, 50-52, 68-69.  Ms. Shugar's alleged activity goes beyond simply inducing Sunline to enter the Affiliate Referral Agreement; she is the one allegedly responsible for carrying out the promises outlined in the agreement.  Ms. Shugar's alleged misrepresentations regarding her legal credentials are but one aspect of the relationship between her, Sunline, and Sterling.  *E.g.*, *id.* ¶¶ 50-52.  The allegations reflect not just personal conduct, but activity under the terms of the Affiliate Referral Agreement forming the basis for Sunline's breach-of-contract claim against Sterling.

Therefore, we disagree with Sunline's argument that the claims against Ms. Shugar "do not implicate any contract."  DI 34 at 12.

**IV.**   <u>**Conclusion**</u>

To briefly recapitulate, we started by concluding that Canada is an adequate alternative forum.  The plaintiff's chosen forum enjoys "a strong presumption of convenience" and should not be disturbed short of "exceptional circumstances."  *Windt*, 529 F.3d at 190; *see Gulf Oil*, 330 U.S. at 504.  We then turned to the private and public interest factors to see if they could overcome plaintiff's choice.  They did not.

Among the private interest factors, the "relative ease of access to sources of proof" and the "availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses" offer modest support in favor of dismissal.  The "possibility of view of premises" bears no significance.

Among the public interest factors, "administrative difficulties flowing from court congestion" is irrelevant.  The "local interest in having localized controversies decided at home" and the "unfairness of burdening citizens in an unrelated forum with jury duty" weigh against dismissal.  However, the related interests in "having the trial of a diversity case in a forum that is at home with the law that must govern the action" and the "avoidance of unnecessary problems in conflict of laws, or in the application of foreign law" support dismissal.  In total, the public interest factors are either in equipoise or perhaps weigh slightly against dismissal.

All told, the private and public interest factors slightly favor Canada, but Ms. Shugar has failed to meet the heavy burden of demonstrating that "the balance of the public and private factors 'tips decidedly in favor of trial in the foreign forum.'"  *Windt*, 529 F.3d at 192 (quoting *Lacey II*, 932 F.2d at 180.  We therefore deny the defendant's motion to dismiss for *forum non conveniens*.

But having decided to retain the case, we then considered Ms. Shugar's alternative request to compel arbitration.  The allegations in Sunline's complaint, paired with the Affiliate Referral Agreement between Sunline and Sterling, show that an agency relationship existed between Ms. Shugar and Sterling.  And Sunline's fraud and RICO claims are predicated on Ms. Shugar's alleged conduct in executing the Affiliate Referral Agreement.  Therefore, we will grant that aspect of Ms. Shugar's motion and we order this case into arbitration.